Filed 1/22/14  Trapasso v. Romero CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(San Joaquin)

----

| | |
|---|---|
| JOHN TRAPASSO, | C070044 |
| Plaintiff and Appellant, | (Super. Ct. No. 39200900230085CUPASTK) |
| v. | |
| JOSE ROMERO ET AL., | |
| Defendants and Respondents. | |

Plaintiff John Trapasso sued defendants Jose Romero and Romero's employer, Trees, Inc,. for injuries he suffered when his motorcycle collided with the truck that Romero was driving.  The jury returned a defense verdict.  Trapasso moved for a new trial on the basis, inter alia, of juror misconduct, submitting juror declarations showing that two jurors presented mathematical calculations to the jury and one juror found those calculations on the Internet.  The trial court denied the motion for a new trial and

1

Trapasso appeals.  We find the juror declarations are insufficient to show juror misconduct.  Accordingly, we shall affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Accident*

The accident occurred on December 15, 2007, on State Highway 4, a two-lane road with a posted speed limit of 55 miles per hour.  Romero was driving a tree-trimming truck and towing a wood chipper.  He pulled onto Highway 4 from an agricultural road; he had to go one-tenth of a mile to a dairy where he was to deliver his load of wood chips.  Because his load of eucalyptus chips was large and heavy, he was able to drive at only 25 miles per hour.

Motorcyclists Trapasso, Brian Justice, Tom Ford, and Joe Placencia were riding on Highway 4, in a two by two formation, slightly staggered, when they came up behind Romero's truck.  Trapasso and Justice attempted to pass the truck on the left.  As they did so, the truck made a left turn and Trapasso and Justice collided with the truck as it entered the driveway of the dairy.

*Plaintiffs' Case*

Trapasso and Justice sued Romero and Trees, Inc. for damages they suffered in the collision.  Justice is not a party on appeal.  The case went to trial before a jury.  Almost every aspect of liability was contested.

Trapasso was unable to testify about the accident as he had no memory of it.  Justice and Placencia testified all the motorcycles slowed to the speed of the truck and Trapasso waited until the double yellow line ended before passing and Justice followed.  They did not see a turn signal.  The truck moved abruptly to the left, cutting off Trapasso and Justice with no escape route.

Plaintiffs' expert accident reconstructionist testified the accident happened in the manner testified to by the motorcyclists, and Romero was at fault for making the left turn.  The expert testified the motorcycles accelerated from 25 to about 55 miles per hour as

2

they attempted to pass, and both motorcycles were fully occupying the east bound lane when the truck began to turn. Trapasso's motorcycle was going 53 miles per hour at the point of impact. The expert testified about how far a vehicle would travel at various speeds to support his conclusions.

The California Highway Patrol (CHP) officer who investigated the accident did not suspect that alcohol was involved. The officer testified that his inspection at the accident scene revealed that the brake lights and turn signal on the truck worked, but there were no functional lights on the chipper. The chipper's lights were repaired shortly after the accident.

*Defendants' Case*

Romero testified he inspected the truck the day of the accident and all the lights on the chipper were working. When he entered Highway 4, he saw the motorcycles in the far distance. He turned on the left turn signal eight seconds before the turn. Before he made the turn, he checked his mirrors and saw only a car "not very close." Before he turned, he had no reason to believe anyone would attempt to pass on his left.

Several motorists that the motorcycles passed on Highway 4, minutes before the accident, testified the motorcyclists were going fast, between 65 and 80 miles per hour. One saw the truck's left turn signal on before the motorcycles began to pass. Another saw the turn signal on the chipper blinking after the accident before the truck was turned off or the police arrived. A third witness reported that Justice made inconsistent statements. He overheard Justice tell one of the other motorcyclists (either Ford or Placencia) that he did not see the "son of a bitch's" taillights until the last second when he had no choice but to run into the back of Trapasso, but Justice told the CHP he was not sure what happened.

The expert accident reconstructionist for the defense believed the motorcycles were going at least 50 miles per hour and perhaps as much as 70 at the time of the accident based on the damage to the motorcycles. He challenged the view of the

3

plaintiffs' expert that the motorcycles accelerated from 25 miles per hour because it was unreasonable that Trapasso would not have braked to avoid the accident at that speed. A motorcycle expert testified the formation that the motorcyclists rode in, side by side pairs, was unsafe. He also claimed they should have tried to pass the truck one at a time.

The defense also presented evidence that Trapasso consumed alcohol at lunch that day and had alcohol in his system after the crash.

*Verdict and Motion for New Trial*

The jury returned a defense verdict. By a vote of nine to three, the jury answered "no" to the first question on the special verdict form: "Was Jose Romero negligent?"

Plaintiffs moved for a new trial on numerous grounds, including jury misconduct. They submitted the declarations of four jurors. Three of the jurors provided information about two other jurors presenting extra-record mathematical calculations to the jury.

*Juror Declarations*

Juror Megan McLeod, who did not join the verdict, stated that half of the jurors had their minds made up at the beginning of deliberations and were not willing to consider evidence supporting liability "of which there was plenty." Juror Shaun Hiatt announced, with profanity, that he did not want to see plaintiffs "get a single dime." Hiatt got up to do calculations on the board, letting it be known that he attended University of the Pacific. He also said he had taken math courses, or had a degree in math, and that his math coursework was paying off. Hiatt claimed his calculations showed the speed of the motorcycles at different times. He then "explained and argued that the force of the impact (supposedly shown by his calculations for the various speeds) had to go somewhere and was probably responsible for the connection between the tree chipper and the truck coming loose." Juror Phillip Miller "also got up and put calculations on the board." The rest of McLeod's declaration spoke to the intransigence of the pro-defense block of jurors.

4

Juror David Byrd stated he was eventually persuaded that Romero was not responsible for the accident. He believed, however, that Trees, Inc. had been negligent and was at least partially responsible. Byrd remembered Hiatt doing calculations on the board in an attempt to convince other jurors that the motorcyclists were at fault. The calculations showed how many feet per second the motorcycles would travel at certain speeds. Byrd believed this occurred when the vote was eight to four for the defense.

Juror Miller, who did not join the verdict, declared that half of the jurors had their minds made up when deliberations began and were unwilling to consider evidence of defendants' liability. The most glaring example was Hiatt, who stated forcefully, "I hope they don't get a fucking dime." During deliberations Hiatt "announced that he had a college degree and did mathematical calculations on his cell phone and put them on the board in the jury room trying to prove to the jurors favoring the plaintiffs that the motorcyclists were driving at an excessive rate of speed when the accident happened. I could see that his calculations were all wrong." Because these calculations were "erroneous and misleading," Miller "went home and researched the Internet. I found approximately 10 different calculations on the Internet that were, in my opinion, relevant to the liability discussion. Therefore I brought those calculations into the jury room and I put them on the board the following day."

The fourth juror declaration was from the foreperson, who also did not join the verdict. He did not address the issue of jurors putting calculations on the board.

At the hearing on the new trial motion, the trial court asked what type of calculations were performed. Plaintiffs' counsel answered he knew only that they were "mathematical." The court recalled that experts had testified to speeds and distances and stated it was difficult to tell if the juror calculations were simple speed/distance calculations or something more. The court also noted there was no evidence that anyone on the jury relied on these calculations. The defense argued there was no evidence of calculations of force, only simple speed/distance calculations. The declarations were

inadequate to show more.  The defense further argued case law established that these simple calculations were permissible; they were just a critical examination of the evidence and were based on facts presented at trial.

The trial court denied the motion for a new trial, making no specific findings as to juror misconduct or any prejudice resulting therefrom.

## DISCUSSION

### I

### *The Law: A New Trial Due to Juror Misconduct*

A trial court may grant a new trial due to juror misconduct.  (Code Civ. Proc., § 657, subd. 2.)  A juror generally commits misconduct when the juror's act "is a direct violation of the oaths, duties, and admonitions imposed on actual or prospective jurors, such as when a juror conceals bias on voir dire, consciously receives outside information, discusses the case with nonjurors, or shares improper information with other jurors. . . . [Citations.]"  (*In re Hamilton* (1999) 20 Cal.4th 273, 294.)

"When a party seeks a new trial based upon jury misconduct, a court must undertake a three-step inquiry.  The court must first determine whether the affidavits supporting the motion are admissible.  (See Evid. Code, § 1150, subd. (a).)  If the evidence is admissible, the court must then consider whether the facts establish misconduct.  [Citation.]  Finally, assuming misconduct, the court must determine whether the misconduct was prejudicial.  [Citations.]"  (*People v. Perez* (1992) 4 Cal.App.4th 893, 905-906.)

"The moving party bears the burden of establishing juror misconduct. [Citations.]"  (*Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 625.) In reviewing a ruling on a new trial motion, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence."  (*People v. Nesler* (1997) 16 Cal.4th 561, 582 (*Nesler*).)  The determination of

whether those facts constitute juror misconduct is a legal question we review independently.  (*People v. Collins* (2010) 49 Cal.4th 175, 242, 232 (*Collins*).)

"Jurors are not supposed to receive or communicate to fellow jurors information from sources outside the evidence presented in court.  [Citation.]  If they do, they are guilty of misconduct.  [Citation.]" (*English v. Lin* (1994) 26 Cal.App.4th 1358, 1363-1364 (*English*).)  "'The requirement that a jury's verdict "must be based upon the evidence developed at the trial" goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury. . . .  [Citation.]'" (*Nesler, supra,* 16 Cal.4th 561, 578.)

Not every consideration of "outside information," however, is misconduct.  "'The jury system is an institution that is legally fundamental but also fundamentally human. Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience.  That they do so is one of the strengths of the jury system.  It is also one of its weaknesses; it has the potential to undermine determinations that should be made exclusively on the evidence introduced by the parties and the instructions given by the court.  Such a weakness, however, must be tolerated.  "[I]t is an impossible standard to require ... [the jury] to be a laboratory, completely sterilized and freed from any external factors."  [Citation.]  Moreover, under that "standard" few verdicts would be proof against challenge.'  [Citation.]  'The safeguards of juror impartiality . . . are not infallible; it is virtually impossible to shield jurors from every contact or influence that might theoretically affect their vote.'  [Citation.]" (*People v. Danks* (2004) 32 Cal.4th 269, 302.)

"It is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial.  Jurors' views of the evidence, moreover, are necessarily informed by their life experiences, including their education and professional work.  A juror, however, should not discuss an opinion explicitly based on specialized information

7

obtained from outside sources.  Such injection of external information in the form of a juror's own claim to expertise or specialized knowledge of a matter at issue is misconduct.  [Citations.]"  (*In re Malone* (1996) 12 Cal.4th 935, 963, fn. omitted.)

Cases have found no misconduct "where jurors employed their own reasoning skills in a demonstrative manner or performed tests in the jury room that were confined to the evidence admitted at trial."  (*People v. Vigil* (2011) 191 Cal.App.4th 1474, 1485, and cases cited.)

## II

### *Analysis*

Trapasso contends jurors Hiatt and Miller committed misconduct by sharing outside information with the other jurors, namely mathematical formulas and equations, and to research the Internet to find these formulas.  He further contends this misconduct raised a presumption of prejudice which defendants failed to rebut.

As a preliminary matter, Trapasso concedes that if all the jurors did was evaluate the evidence using basic rules for time, speed, and distance, their conduct would not be misconduct.  That is a proper concession.

The presentation of mathematical calculations is akin to a jury experiment.  Jurors as a body may "engage in experiments which amount to no more than a careful evaluation of the evidence which was presented at trial."  (*Bell v. State of California* (1998) 63 Cal.App.4th 919, 932.)  They may also "bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience."  (*People v. Marshall* (1990) 50 Cal.3d 907, 950.)

For example, in *Collins, supra,* 49 Cal.4th 175, during deliberations the jurors demonstrated how the victim may have been shot while on his knees, using two jurors as the victim and the defendant, and a piece of string to show the path of the bullet.  Our Supreme Court found no misconduct because the jury, using only variables that were in evidence, was only evaluating the evidence.  (*Id*. at p. 251.)  Nor did the court find

8

misconduct in a juror's home use of a computer to create a model showing the relative positions of the shooter and victim. The diagram did not interject any new evidence from outside the record; the juror used height and distance information presented at trial. (*Id*. at pp. 252-253.) The juror's "use of his computer was simply his own permissible thinking about the evidence received, and was not an experiment resulting in the acquisition of any new facts." (*Id*. at p. 252.)

Here, Hiatt and Miller expressed their respective reasoning processes and why each believed or disbelieved certain witnesses, using understood and accepted formulas for calculating speed and distance.[1] As in *Collins*, use of such formulas does not present additional evidence. While we have found no published California case on the jury's use of mathematical formulas, other states have found no misconduct in the use of such formulas. (*Kendrick v. Pippin* (Colo. 2011) 252 P.3d 1052, 1063-1067 [no misconduct where juror calculated defendant motorist's speed, distance, and reaction time]; *State v. Mann* (N.M. App. 2000) 11 P.3d 564, 588-589 [engineer juror's challenge to expert testimony by formal presentation with calculations not misconduct]; *McIlry v. Wagley* (Tex.Civ.App. 1969) 437 S.W.2d 5, 11 [mathematical calculations supported by evidence do not constitute misconduct].)

Trapasso contends that the conduct of both Hiatt and Miller went beyond simple calculations of speed and distance. He contends their "obtaining physics formulas from the [I]nternet and then using them to make presentations to the jury constituted misconduct." But he fails to establish what type of formulas Hiatt and Miller presented to the rest of the jury, thereby failing to demonstrate that misconduct occurred. A lack of specificity in juror declarations can defeat an attempt to show misconduct. In *English*,

---

[1] Defendant's expert accident reconstructionist testified he used "simple calculations" to convert miles per hour to feet per second to calculate the distance from the truck's turn to the point of impact.

9

*supra,* 26 Cal.App.4th 1358, plaintiff claimed his injuries prevented him from playing college football and the loss of a football scholarship prevented him from obtaining an art degree to fulfill his dream of becoming a commercial artist. After the jury awarded plaintiff of over $500,000, defendant moved for a new trial, citing juror misconduct. A juror declaration stated that during deliberations Juror Foster spoke of his brother-in-law and the salary he made as a commercial artist. (*Id*. at p. 1363.) The court found no misconduct because the declaration failed to specify the circumstances in which Foster's comment was made. "Because of the lack of a specific context for Foster's statements, the trial court reasonably could have concluded that the declaration was insufficient to show that Foster's remarks were intended by him, or interpreted by other jurors, as additional evidence to consider in this case, as opposed to an explanation as to Foster's reasoning processes-i.e., why Foster believed or disbelieved certain witnesses or believed an award of damages would be appropriate or inappropriate or too low or too high." (*Id*. at p. 1365.)

The only specificity in the juror declarations as to Hiatt's calculations indicated he presented calculations to show the speed of the motorcycles. Byrd declared that Hiatt tried to convince the other jurors that the motorcycles were at fault by doing calculations that showed "how many feet per second the motorcycles would travel at various speeds." Miller declared that Hiatt announced he had a college degree and did mathematical calculations on his cell phone; he put these on the board to prove the motorcyclists were speeding when the accident occurred. McLeod's declaration differed slightly. She stated Hiatt did calculations "that were supposed to prove how fast the motorcycles were going when they hit the truck," but also that Hiatt argued "the force of the impact (supposedly shown by his calculations for the various speeds) had to go somewhere and was probably responsible for the connection between the tree chipper and the truck coming loose." Although McLeod's declaration mentioned "force of impact," it did not establish that Hiatt actually *calculated* the force of the impact. The trial court could have reasonably

10

concluded that Hiatt calculated only the speed of the motorcycles and, based on that calculation, argued about the force of impact.

Trapasso contends that "the evidence strongly suggests that Hiatt went far beyond these simple calculations." He argues that if only speed and distance calculations were involved, "it is unlikely" that Miller would have found the calculations "erroneous and misleading;" instead, he would have simply corrected the math. In arguing that Hiatt's calculations went to the physics of accident reconstruction, Trapasso relies on McLeod's declaration that Hiatt argued about the force of the impact and referred to his college math courses and that they were "paying off." Trapasso's argument is based on speculation about what the evidence "suggested" and what was "unlikely" to have occurred. Such speculation is insufficient to carry his burden to show misconduct. (See *People v. Espinoza* (1992) 3 Cal.4th 806, 821 [speculation that a juror "appeared" to be asleep was insufficient to require an inquiry into juror misconduct].).

Tellingly, Miller, who voted in favor of plaintiffs and prepared a declaration in support of the new trial motion, did not describe what Hiatt's calculations were. As we discussed *ante*, plaintiffs' argument about the significance of Miller's Internet use is speculative; the few facts on this subject in his declaration just as easily support the notion that Miller's use of the Internet to refute Hiatt's calculations might be only an indication that Miller lacks math skills, just as Hiatt's reference to his college math courses might be only boasting or a joking reference to the lack of math skills in the general public. There was no evidence that Hiatt's calculations went beyond simple time, speed, and distance calculations.

Miller's conduct presents a closer question. The court instructed the jury: "Do not do any research on your own or as a group. Do not use dictionaries, the internet or other reference materials." Miller stated he "researched the Internet," but it is unclear *what* Miller looked up and whether he actually performed research. Miller stated he found "approximately ten different calculations on the Internet that were, in my opinion,

11

relevant to the liability discussion.  Therefore I brought those calculations into the jury room and I put them on the board the following day."  Perhaps tellingly, Miller failed to describe even the *type* of calculations he found or *what* he was calculating.  He was the only juror with personal knowledge regarding precisely what his Internet search revealed and yet he failed to explain even the general nature of the calculations he brought to the other jurors.  He stated only that the calculations Hiatt used to prove "that the motorcyclists were driving at an excessive rate of speed" were "all wrong."  Thus the record supports a finding of no juror misconduct, as the record supports a finding that all the calculations at issue were simple speed and distance calculations.

Miller's use of the Internet does not necessarily mean that he conducted research or obtained new facts.  The Internet can be used as a tool, like a calculator.  (See *People v. Engstrom* (2011) 201 Cal.App.4th 174, 184-189 [no juror misconduct where juror used a calculator to recalculate marijuana yield substituting a single factor used in expert's formula].)  It was not misconduct for the juror in *Collins* to use his computer as a tool to assist in his drawing.  (*Collins, supra,* 49 Cal.4th at pp. 252-253.)  There are many sites on the Internet that can be used to perform mathematical calculations, such as converting miles per hour into feet per second, calculations that can be performed with a pencil and paper.  Absent any evidence to the contrary, we find the trial court could reasonably conclude (as it implicitly did) that Miller used the Internet only as a tool to make, in his view, the proper calculations about the speed of the motorcycles.

Here, as in *English,* nothing in any of the juror declarations indicated the calculations presented by Hiatt and Miller were intended by them, or interpreted by other jurors, to be additional evidence or anything beyond an explanation of their reasoning.  (*English, supra,* 26 Cal.App.4th at pp. 1365-1366.)  Notably, some of the submitted juror declarations did not even mention the calculations.

In summary, the trial court did not abuse its discretion in denying the motion for a new trial because the juror declarations were insufficient to show juror misconduct.

12

From the information in the declarations, it appears that the dueling calculations of speed and distance did not introduce new evidence, but were based on facts of generalized knowledge.  The evidence shows only that Hiatt and Miller used these calculations to explain and argue their view of the evidence, a use that is not improper in jury deliberations.  Without more, we find no error.

## DISPOSITION

The judgment is affirmed.  Defendants shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)


                                        DUARTE            , J.



We concur:



        BLEASE            , Acting P. J.



        MAURO            , J.




13